UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY FERRISS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALLIANCE PUBLISHING, INC., et al.,<br><br>Defendants. | Case No.  15-cv-05675-EMC<br><br>**PUBLIC/REDACTED VERSION**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**<br><br>Docket No. 53 |

## I.    INTRODUCTION

Plaintiffs Timothy Ferriss and Krisa Performance, LLC brought this lawsuit against Defendants Peagan Twitty, Alliance Publishing, Inc. (API), Alliance Publishing Services, Inc. (APS) (collectively, the Alliance Defendants), Candice Cunningham, and Wealth Partners Publishing (collectively, the Wealth Partners Defendants) for the unauthorized use of Ferriss's name, photograph, persona, and likeness, as well as Krisa's protected trademarks, through a "get rich quick" scheme offered on the Internet and by mail.  Docket No. 1 (Complaint); Docket No. 12 (First Amended Complaint).

Plaintiffs served the Alliance Defendants, Docket Nos. 10, 21, 22, but the Alliance Defendants have not appeared in the case.  The Clerk of the Court entered the Alliance Defendants' default on March 8, 2016.  Docket No. 34.  When Defendant Twitty received the Clerk's entry of default, she contacted Plaintiffs' counsel claiming that her identity had been stolen, but failed to provide any evidence to support her claim.  Docket No. 55 (Declaration of Lauren B. Cohen) at ¶¶ 3-5.  In contrast, the Wealth Partners Defendants agreed to the entry of a final judgment and permanent injunction against Cunningham and Wealth Partners Publishing, Docket No. 68, which this Court approved on October 17, 2016, Docket No. 71.

United States District Court<br>For the Northern District of California

**United States District Court**
For the Northern District of California

Pending before the Court is Plaintiffs' motion to enter judgment against the Alliance Defendants for an injunctive relief barring future infringing conduct, compensatory and punitive damages, attorneys' fees, and costs of suit.  Docket No. 53 (Plaintiffs' Motion for Default Judgment).  This motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.   BACKGROUND

A.   Plaintiffs Timothy Ferriss and Krisa Performance, LLC

Plaintiff Ferriss is an author, podcaster, and public speaker.  Docket No. 12 (First Amended Complaint) at ¶¶ 14, 17.  He wrote three number one *New York Times* best-selling books.  *Id.* at ¶ 15.  Ferris also has a podcast, which has been ranked number one podcast on all of iTunes and has exceeded tens of millions of downloads.  *Id.* at ¶ 17.  Ferriss has been featured by more than 100 media outlets, including *The New York Times*, and has been a popular guest lecturer at Princeton University since 2003.  *Id.* at ¶ 18.  In addition, Ferriss has been invited to speak at innovative organizations, including MIT, the Central Intelligence Agency, Microsoft, and has been invited to speak and keynote at world-renowned technology summits.  *Id.* at ¶ 19.

Ferriss resides in San Francisco, California.  *Id.* at ¶ 1.  Ferriss also runs his business, including Krisa Performance, in San Francisco, California.  *See* Docket No. 78 (Second Supplemental Declaration of Timothy Ferriss) at ¶ 4.  San Francisco is where the vast majority of his business operations take place.  *See* Docket No. 77 (Supplemental Brief) at 2.

Ferriss's company, Plaintiff Krisa Performance, LLC, owns the trademarks associated with his books, including the following federally registered marks: the TIM FERRISS marks (Registration Nos. 3,977,565 and 4,462,764); the TIMOTHY FERRISS marks (Registration Nos. 3,977,567 and 4,536,123); and THE 4-HOUR WORKWEEK marks (Registration Nos. 3,492,243 and 3,861,282) (the Krisa Trademarks).  Docket No. 12 (First Amended Complaint) at ¶¶ 21-29.

Krisa is a California limited liability company located in San Francisco, California.  *Id.* at ¶ 3.  It has its principal place of business in San Francisco.  Docket No. 78 (Second Supplemental Declaration of Timothy Ferriss) at ¶ 3.

B.   Defendants' Flyer Advertising the Scam

The Alliance Defendants are engaged in direct marketing "get rich quick" scheme.  Docket

2

1    No. 12 (First Amended Complaint) at ¶ 30.  They advertised the scheme with their marketing flyer

2    (hereinafter the Alliance Flyer), which they distributed through the mail and on the Internet.  *Id.* at

3    ¶¶ 30-31.  Plaintiffs believe that Defendant Peagan Twitty is responsible for creating and

4    distributing the Alliance Flyer.  *Id.* at ¶ 32.  The Alliance Flyer lists Alliance Publishing Inc. as the

5    responsible corporate entity and uses the contact email address

6    alliancepublishingonline@gmail.com.  *Id.*; Docket No. 12, Ex. D (containing the phrase

7    "Copyright © 2014 Alliance Publishing, Inc. All Rights Reserved").

8          The scheme advertised in the Alliance Flyer purports to give individuals access to a system

9    that will help them earn money.  *See* Docket No. 12, Ex. D.  To participate in the scheme, the

10   Alliance Flyer directs individuals interested in the scheme to mail $97 to Alliance Publishing, Inc.

11   and $100 to a "dealer" located in Fort Wayne, Indiana, who will then mail out the individual's

12   flyers.  *Id.*   The Flyer does not, however, describe precisely how one earns money.  At the top of

13   the first page and on the third page of the flyer, the Alliance Flyer displays Ferriss's name and

14   picture, as well as the Krisa Trademarks, and attributes a false quote to Ferriss endorsing the

15   scheme.  *See id.*  Ferriss claims to have never endorsed the scheme or made the statement

16   attributed him; nor did he authorize the use of his name or photograph in connection with the

17   scheme.  Docket No. 12 (First Amended Complaint) at ¶ 31.

18         Defendant Cunningham claims that she received the Alliance Flyer from Alliance

19   Publishing, Inc. and subsequently sent payment to Alliance Publishing, Inc. in exchange for the

20   rights to distribute the flyer.  Docket No. 55 (Declaration of Lauren B. Cohen) at ¶ 8.

21   Cunningham then revised the Alliance Flyer to include contact information for herself and Wealth

22   Partners Publishing (hereinafter the Wealth Partners Flyer).  *Id.* at ¶ 9; *see* Docket No. 12, Ex. F.

23   Cunningham also claims that she distributed the Wealth Partners Flyer to approximately 27,500

24   individuals at the direction of Alliance Publishing, Inc. Docket No. 55 (Declaration of Lauren B.

25   Cohen) at ¶ 10.  The mailing list provided to Cunningham by Alliance Publishing Inc. contains

26   approximately 35 pages of individuals with California addresses.  *Id.* at ¶ 11.

27   C.    Procedural History and Service of Complaint

28         On December 11, 2015, Plaintiffs brought this suit against Defendants Alliance Publishing,

3

1   Inc., Wealth Partners Publishing, Candice Cunningham, and Peagan Twitty, alleging four causes

2   of action: (1) violation of the right of publicity (Cal. Civ. Code § 3344); (2) false designation of

3   origin (15 U.S.C. § 1125(a)); (3) trademark infringement (15 U.S.C. § 1114); and (4) unfair

4   competition (Cal. Bus. & Prof. Code § 17200).  Docket No. 1 (Complaint).

5          On December 15, 2015, Plaintiffs personally served Twitty, residing in Maryland.  Docket

6   No. 10.  In attempting to serve API, Plaintiffs discovered that it is not an existing corporation.

7   Docket No. 12 (First Amended Complaint) at ¶ 4; *see* Docket No. 17.  Plaintiffs claim that

8   Alliance Publishing, Inc. may be an alternate name for Alliance Publishing Services, Inc. or a

9   fictitious business name for Twitty.  Docket No. 12 (First Amended Complaint) at ¶¶ 4, 32.

10          On January 7, 2016, Plaintiffs filed their First Amended Complaint (FAC).  Docket No. 12.

11   The FAC clarified that API is a fictitious business name used by Defendant Twitty.  *Id.*

12   Additionally, the FAC added a new defendant, Alliance Publishing Services, Inc., a Florida

13   corporation registered by Defendant Twitty.  *Id.* at ¶ 3.  On January 14, 2016, Plaintiffs personally

14   served APS.  Docket No. 21.  Additionally, on January 19, 2016, Plaintiffs personally served

15   Defendant Twitty on behalf of API, the alleged fictitious business name used by Twitty.  Docket

16   No. 22.  Further, Plaintiffs served Defendant Twitty with the FAC by mail, per Fed. R. Civ. P.

17   5(a)(2).  Docket No. 53 (Plaintiffs' motion for default judgment) at 6.

18          The Alliance Defendants failed to respond to either the Complaint or the FAC.  *Id.*  On

19   March 8, 2016, the Clerk of the Court entered the default of the Alliance Defendants.  Docket No.

20   34.  On March 10, 2016, Twitty left a voicemail with the legal secretary of Plaintiffs' counsel,

21   claiming that she had received the Clerk's notice.  Docket No. 55 (Declaration of Lauren B.

22   Cohen) at ¶ 2.  On March 11, 2016, Plaintiffs' counsel Lauren B. Cohen spoke with Twitty

23   regarding the case.  *Id.* at ¶ 3.  Twitty claimed that her identity had been stolen and that another

24   person had set up the Alliance Publishing corporations using her name and was running the scam

25   under her name.  *Id.*  When Cohen asked for proof of the alleged identity theft, Twitty claimed to

26   have no such proof.  *Id.* at ¶ 4.  Twitty never provided Plaintiffs' counsel with any evidence

27   corroborating her claim that her identity was stolen.  *Id.*

28          Plaintiffs and the Wealth Partners Defendants agreed to the entry of a final judgment and

**United States District Court**
For the Northern District of California

4

1  permanent injunction against Cunningham and Wealth Partners Publishing, Docket No. 68, which

2  this Court approved on October 17, 2016, Docket No. 71.

3                          **III.    DISCUSSION**

4  A.    Entry of Default Judgment

5          Plaintiffs moved to enter default judgment against the Alliance Defendants.  Docket No. 53

6  (Plaintiffs' Motion for Default Judgment).

7              1.    Jurisdiction

8          The Alliance Defendants have not raised any jurisdictional challenge.  However, this does

9  not excuse the Court from its "affirmative duty to look into its jurisdiction over both the subject

10  matter and the parties" when "entry of judgment is sought against a party who has failed to plead

11  or otherwise defend."  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

12                  a.    Subject Matter Jurisdiction

13          Plaintiffs claim trademark infringement under 15 U.S.C. § 1114 and false designation of

14  origin under 15 U.S.C. § 1125(a).  *See* Docket No. 12 (First Amended Complaint) at ¶¶ 9, 49-61.

15  These claims involve federal questions pursuant to 28 U.S.C. § 1331 and arise under federal law

16  pursuant to 28 U.S.C. § 1338(a).  Thus, the Court has subject matter jurisdiction over these claims.

17          Further, Plaintiffs claim violations of the right of publicity under California Civil Code §

18  3344 and unfair competition under California Business & Professional Code § 17200.  The Court

19  finds that these state claims share a common nucleus of operative fact as the federal claims.  Thus,

20  pursuant to 28 U.S.C. § 1367(a), the Court can exercise supplemental jurisdiction over the state

21  claims.

22          Thus, the Court has subject matter jurisdiction over the entire case.

23                  b.    Personal jurisdiction

24          No federal statute governs personal jurisdiction in this case.  Accordingly, in determining

25  personal jurisdiction, the Court applies the law of California, the state in which the Court sits.

26  *Core–Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1484 (9th Cir.1993).  California's long-

27  arm statute permits courts to exercise personal jurisdiction over a defendant to the extent permitted

28  by the Due Process Clause of the Constitution.  Cal.Code Civ. P. § 410.10; *see Gordy v. Daily*

5

*News, L.P.*, 95 F.3d 829, 831 (9th Cir.1996) ("California's long-arm statute extends jurisdiction to the limits imposed by the Due Process Clause.").   "[P]ersonal jurisdiction may be founded on either general jurisdiction or specific jurisdiction." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1008 (N.D. Cal. 2014).

Plaintiffs concede that Defendants Twitty and Alliance Publishing , Inc. are located in Maryland and that Alliance Publishing Services, Inc. is located in Florida.  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 8.  They contend, however, that this Court has specific jurisdiction over these defendants.  For the reasons stated below, the Court agrees.

The Ninth Circuit has articulated the following three-prong test to determine whether a district court may exercise specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015).  The plaintiff must prove the first two prongs, at which point, "the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* at 1211-12 (quotation omitted).

### i.    First Prong:  Purposeful Direction

For the first prong, the "purposeful direction" analysis governs tort claims.  *See Picot*, 780 F.3d at 1212 ("For claims sounding in tort, we . . . apply a "purposeful direction" test . . . .").  Plaintiffs' claims for violations of the right of publicity (Cal. Civ. Code § 3344), false designation of origin (15 U.S.C. § 1125(a)), trademark infringement (15 U.S.C. § 1144), and California statutory unfair competition (Cal. Bus. & Prof. Code § 17200) are tort claims.  *See* Docket No. 12 (First Amended Complaint) at ¶ 11 ("This Court has personal jurisdiction over Defendants, as the tortious conduct alleged in this First Amended Complaint took place in this District . . . .").  The Ninth Circuit normally employs the so-called "effects" test in purposeful direction cases, which

imposes three requirements: "the defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

First, the Alliance Defendants acted intentionally when they created the Alliance Flyer advertising their "get rich quick" scam and falsely used Ferriss's name and the Krisa Trademarks. *See GT Sec., Inc. v. Klastech GmbH*, 2014 WL 2928013, at *13 (N.D. Cal. June 27, 2014) ("The first prong of purposeful direction is easily satisfied and generally glossed over by the courts."). The creation of such advertising campaign constitutes an intentional act for purposes of the purposeful direction test. *See, e.g.*, *Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*, 2016 WL 1027998, at *7 (C.D. Cal. Mar. 14, 2016) ("Here, Havas New York committed an intentional act in its creation of the advertising campaign.").

Second, the Alliance Defendants expressly aimed their act at California. They directed the Wealth Partners Defendants to mail the fraudulent flyers to residents in California by providing them with thirty-five pages of California addresses to send the Wealth Partners Flyer to. Docket no. 55 (Declaration of Lauren B. Cohen) at ¶¶ 10-11. As a result, the harm occurred in California, where the California residents who received the flyer were likely misled into believing that Ferriss and Krisa were affiliated with the scam. Moreover, Ferriss suffered harm to his right of publicity and Krisa suffered harm to its trademarks in San Francisco: Ferriss resides and runs most of his business in San Francisco, California, Docket No. 78 (Second Supplemental Declaration of Timothy Ferriss) at ¶ 4; and Krisa is a California limited liability company with its principal place of business in San Francisco, *id.* at ¶ 3.

To be sure, "mere injury to a forum resident" is "not a sufficient connection to the forum" to establish personal jurisdiction. *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). "The proper question" in deciding personal jurisdiction is "whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* Unlike the defendant in *Walden* who "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [the forum state]," *id.* at 1124, the Alliance Defendants directed the Wealth Partners Defendants to mail the

fraudulent flyers to many residents in California. *See D.light Design, Inc. v. Boxin Solar Co.*, 2015 WL 7731781, at *2 (concluding that *Walden* does not preclude the exercise of personal jurisdiction over the defendants).

Third, the Alliance Defendants caused harm that they knew is likely to be suffered in the forum state. The Ninth Circuit has held that, for jurisdictional purposes, harm is foreseeably suffered in the forum where the plaintiff is known to reside. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1131 (9th Cir. 2010) ("It was also foreseeable that some of this harm would occur in the Forum, where Brayton Purcell was known to reside."). For corporations, such forum is "the forum of . . . [their] principal place of business." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011).

Here, the Alliance Defendants likely knew that Krisa would suffer harm to its trademarks, goodwill, and reputation in San Francisco, where it has its principal place of business, *id.* at ¶ 3. *See Facebook, Inc. v. Pedersen*, 868 F. Supp. 2d 953, 961 (N.D. Cal. May 21, 2012) ("The Court finds that the third element of the . . . test is met here, because defendants likely knew that any harm suffered by Facebook would be suffered in California, as Facebook's principal place of business is in California."). It was also foreseeable that Ferriss would suffer harm in San Francisco, where he lives. Ferriss's presence in this District was "well known." Docket No. 77 (Supplemental Brief) at 2. Ferriss openly discussed the fact he lives in San Francisco in interviews, podcasts, and books. Docket No. 78 (Second Supplemental Declaration of Timothy Ferriss) at ¶ 2. The Wikipedia page describing Ferriss's accomplishments also reports that he lives in San Francisco. Docket No. 79 at ¶ 2, Ex. A. And as it may be inferred that numerous flyers were mailed to California residents, Ferriss's reputation in the state was presumably affected.

Moreover, Plaintiffs alleged in the FAC that the Alliance Defendants "knew or reasonable should have known that their conduct alleged in [the] . . . First Amended Complaint would cause injury to Plaintiffs in this District." Docket No. 12 (First Amended Complaint) at ¶ 11. Since the Alliance Defendants defaulted, the Court takes this allegation as true. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008) (holding that all factual allegations in the

8

1    complaint are deemed true upon entry of default).

2                          ii.    Second Prong:  Relation to Forum

3          For the second prong, the Ninth Circuit relies on a "'but for' test to determine whether a

4    particular claim arises out of forum-related activities." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th

5    Cir. 1995).  This test asks whether the cause of action would not have arisen, but for the contacts

6    between the defendant and the forum state.  *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th

7    Cir. 1995). Here, but for the Alliance Defendants' express targeting of Plaintiffs by conduct

8    directed to California, Plaintiffs' injuries would not have occurred.  *See Lions Gate Entm't Inc. v.*

9    *TD Ameritrade Services Company, Inc.*, 2016 WL 1027998, at *9 (C.D. Cal. Mar. 14, 2016)

10   ("Here, but for [defendant's] nationwide advertisement campaign allegedly using Plaintiff's

11   protected intellectual property, Plaintiff would not have been harmed in its home forum,

12   California"); *Nissan Motor Co. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1160 ("[T]he

13   defendant's intentional exploitation of the plaintiffs' goodwill and diversion of the plaintiffs'

14   potential customers [via the Internet] had the effect of injuring [plaintiffs] in California. But for

15   the [defendant's] conduct, this injury would not have occurred.").  Due to the Alliance

16   Defendants' misappropriation of Ferriss's name and likeness in advertising the "get rich quick"

17   scam, Ferriss suffered damage to the goodwill associated with his name, likeness, and persona.

18   Docket No. 12 (First Amended Complaint) at ¶ 42.  Moreover, due to the Alliance Defendants'

19   unauthorized use of the Krisa Trademarks, and the directed mailings of the fraudulent flyer to

20   California residents, Krisa suffered damage to its reputation and goodwill.  *Id.* at ¶¶ 57-59.

21                          iii.   Third Prong:  Reasonableness of Jurisdiction

22         Since the first two prongs are met, the burden shifts to the Alliance Defendants to argue

23   that the Court's exercise of jurisdiction does not comport with fair play and substantial justice.

24   The Alliance Defendants essentially waived the opportunity to bear this burden by failing to

25   appear in this litigation. *See Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. Oct. 1,

26   2014) ("Defendant Catron has essentially waived his opportunity to make this showing by failing

27   to participate in this litigation.").  Moreover, no facts before the Court indicate that the exercise of

28   personal jurisdiction would be unreasonable.  Thus, the Court finds that the third prong is

United States District Court
For the Northern District of California

9

satisfied.  *See Telles v. Li*, 2013 WL 5199811, at *5 (N.D. Cal. Sept. 16, 2013) ("Because Plaintiffs have satisfied the first two prongs and no facts before the Court suggest that the exercise of personal jurisdiction is unreasonable, the Court finds the third prong also is satisfied.").

> 2.   Service

In deciding whether to grant or deny a default judgment, as a preliminary matter, a court must "assess the adequacy of the service of process on the party against whom default is requested."  *Bd. of Trustees of the N. Cal. Sheet Metal Workers v. Peters*, 2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan. 2, 2001).

> a.   Defendant Peagan Twitty

Plaintiffs properly served Defendant Twitty with the original Complaint and Summons because they personally served her on December 16, 2015, Docket No. 1 (Compl.); Docket No. 10.  *See* Fed. R. Civ. P. 4.

The question is whether Plaintiffs also properly served Defendant Twitty with the First Amended Complaint. When a plaintiff files an amended complaint adding a new defendant, Rule 5 of the Federal Rules of Civil Procedure governs the service of the amended complaint as to the existing defendants. *See* Commentary on Rule 5.  Rule 5 allows service by mail.  *Id.*  As long as the parties supply a current and correct mailing address, service by mailing to the last known address is complete upon mailing, even if the mail is not received.  *Id.*

Rule 5 governs Plaintiffs' service of the FAC because Plaintiffs added a new defendant, Alliance Publishing Services, Inc., in the FAC and because Twitty was an existing defendant. Plaintiffs served Twitty with the FAC by mail, and there is no indication that they used an address different from the one they used in personally serving Twitty on December 16, 2015.  Thus, Plaintiffs' service to Twitty was complete upon mailing.

> b.   Defendant Alliance Publishing Services, Inc.

Under California law, a summons and complaint may be properly served on a corporation by delivering a copy of the documents (1) to the "person designated as agent for service" under certain provisions of the California Corporations Code or (2) to the "president or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a

1   general manager, or a person authorized by the corporation to receive service of process."  Cal.

2   Code Civ. P. § 416.10(a), (b).

3          Plaintiffs personally served John Gurba, who is a registered agent for APS, on January 14,

4   2016.  Docket No. 21.  Thus, APS was properly served.

5                    c.      Defendant Alliance Publishing, Inc.

6          In addition to being served personally, a corporation may also be served under California

7   law via "substitute service," that is,

8          [i]n lieu of personal delivery of a copy of the summons and
           complaint to the person to be served as specified in Section 416.10,
9          . . . a summons may be served by leaving a copy of the summons
           and complaint during usual office hours in his or her office or, if no
10         physical address is known, at his or her usual mailing address, other
           than a United States Postal Service post office box, with the person
11         who is apparently in charge thereof, and by thereafter mailing a
           copy of the summons and complaint by first-class mail, postage
12         prepaid to the person to be served at the place where a copy of the
           summons and complaint were left.
13

14   Cal. Code Civ. P. § 415.20(a).

15         Plaintiffs personally served Twitty on behalf of API, alleging that API is a fictitious

16   business name used by Twitty.  This is problematic, however.  If API does not exist, as Plaintiffs

17   alleges, there is nothing for the Court to enter a default judgment against.  On the other hand, if

18   API does exist, Plaintiffs' service upon Twitty is not sufficient because there is no evidence that

19   Twitty is either (1) the person designated as agent for service under certain provisions of the

20   California Corporations Code or (2) the "president or other head of the corporation, a vice

21   president, a secretary or assistant secretary, a treasurer or assistant treasurer, a general manager, or

22   a person authorized by the corporation to receive service of process."  Cal. Code Civ. P. §

23   416.10(a), (b).  Moreover, Plaintiffs failed to serve API via substitute service because they never

24   mailed a copy of the FAC to API by first-class mail.  Service on Twitty based on Plaintiffs' "as-

25   of-yet-unproven" claim of alter-ego liability does not suffice, as other courts have held.  *Calista*

26   *Enterprises Ltd. v. Tenza Trading Ltd.*, 2014 WL 3670856, at *3 (D. Or. July 23, 2014); *Neumont*

27   *Univ., LLC v. Nickles*, 304 F.R.D. 594, 598 (D. Nev. 2015).

28

**United States District Court**
For the Northern District of California

11

i.      *Eitel* Factors

Since the Court finds that the service to the Alliance Defendants was sufficient, the Court should determine whether to grant a default judgment on the merits of the case.  *See* Fed. R. Civ. P. 55.  "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Factors that a court may consider in exercising that discretion include:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

As Plaintiffs argue in their motion for default judgment, Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 10-18, these factors weigh in favor of entering default judgment.

(a)      The Possibility of Prejudice to the Plaintiff

Plaintiffs will suffer prejudice if the Court does not enter default judgment because they "would be left without recourse to recover for the harm already inflicted by" the Alliance Defendants and "to prevent future infringement" of the Krisa Trademarks, unfair competition, and misappropriation of Ferriss's name, image, and likeness.  *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. Oct. 1, 2014).

(b)      The Merits of Plaintiff's Substantive Claim and (c) The Sufficiency of the Complaint

Courts generally consider the merits of the plaintiff's substantive claims and sufficiency of the complaint together.  *Id.*  A plaintiff satisfies the second and third *Eitel* Factors if the allegations in the complaint adequately plead the asserted claims.  *IO Grp., Inc. v. Jordan*, 708 F. Supp. 2d 989, 997-1000 (N.D. Cal. 2010) (applying the second and third *Eitel* Factors by determining whether factual allegations in the complaint, taken as true, adequately pled each cause of action).  The Court finds that Plaintiffs have sufficiently pled in the FAC their claim for violation of the right of publicity under California Civil Code § 3344; claim for trademark infringement under 15

**United States District Court**
For the Northern District of California

1  U.S.C. § 1144; claim for false designation of origin under 15 U.S.C. § 1125(a); and claim for

2  unfair competition under California's statutory unfair competition law.

3           (d)     <u>The Sum of Money at Stake in the Action</u>

4       "When the money at stake in the litigation is substantial or unreasonable, default judgment

5  is discouraged." *Bd. of Trs. v. Core Concrete Const., Inc.*, 2012 WL 380304, at *4 (N.D. Cal. Jan.

6  7, 2012).  However, when "the sum of money at stake is tailored to the specific misconduct of the

7  defendant, default judgment may be appropriate." *Id.*  Here, Plaintiffs seek between $1,214,275

8  and $2,098,275 in damages.  This amount is not insignificant.  Moreover, this is not a conservative

9  estimate tailored to the specific misconduct of the Alliance Defendants, as the Court finds below.

10  Thus, this factor advises against entering default judgment as to damages.  However, it is tailored

11  to the injunctive relief sought.

12           (e)     <u>The Possibility of a Dispute Concerning Material Facts</u>

13       Because the Alliance Defendants have not filed an answer to the complaint or otherwise

14  appeared in this case, there is little to suggest that there is a possibility of dispute concerning

15  material facts.  *See Transamerica Life Ins. Co. v. Estate of Ward*, 2011 WL 5241257, at *4 (E.D.

16  Cal. Oct. 31, 2011) (finding that "there is a very low likelihood that any genuine issue of material

17  fact exists" because "the court [assumes] the truth of well-pleaded facts in the complaint following

18  the clerk's entry of default"); *see also W. Reserve Life Assur. Co. of Ohio v. Canul*, 2012 WL

19  844589, at *3 (E.D. Cal. Mar. 12, 2012) ("[T]here is little possibility of dispute concerning

20  material facts because (1) based on the entry of default, the Court accepts all allegations in

21  Plaintiff's Complaint as true and (2) Defendant has not made any effort to challenge the

22  Complaint or otherwise appear in this case.").

23       However, Plaintiffs concede that Twitty once claimed innocence.  Docket No. 55

24  (Declaration of Lauren B. Cohen) at ¶ 3.  Specifically, on March 11, 2016, Twitty told Plaintiffs'

25  counsel that her identity had been stolen and that another person had set up the Alliance

26  Publishing corporations using her name and was running the "get rich quick" scam under her

27  name.  *Id.*  Twitty's claim directly conflicts with Plaintiffs' allegation that Twitty is responsible

28  for setting up the Alliance Publishing corporations and creating the fraudulent flyers.

The Court resolves the dispute in favor of Plaintiffs because "[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir.1987) (internal quotation marks omitted).  Moreover, Twitty failed to support her claim in any way.  During the phone conversation, Plaintiffs' counsel asked if Twitty could provide her with any documentation or proof of the alleged identity theft.  Docket No. 55 (Declaration of Lauren B. Cohen) at ¶ 4.  She claimed to have no such proof and has not provided Plaintiffs' counsel with any evidence corroborating her claim that her identity was stolen.  *Id.*  To date, Twitty failed to make any further efforts to prove that her identity had been stolen.  *Id.* at ¶ 5.

(f)       Whether the Default was Due to Excusable Neglect

Plaintiffs properly served the Alliance Defendants, with the exception of API.  The fact that Defendant Twitty has contacted Plaintiffs' counsel claiming innocence shows that Twitty was aware of this lawsuit.  *See PepsiCo, Inc. v. California Sec. Cans,* 238 F. Supp. 2d 1172, 1177 (C.D. Cal. Dec. 27, 2002) (finding that "the possibility of excusable neglect is remote" because the defendant had contacted the plaintiffs' counsel to discuss settlement).  Moreover, there is no evidence that the Alliance Defendants' default was the result of an excusable neglect.

(g)       The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits

This factor does not favor entering default judgment because of the policy that "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the mere existence of Fed. R. Civ. P. 55(b) indicates that "this preference, standing alone, is not dispositive." *Kloepping v. Fireman's Fund*, 1996 WL 75314, at *3.  Moreover, the Alliance Defendants' "failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible." *PepsiCo*, 238 F. Supp. 2d at 1177.  Under Fed. R. Civ. P. 55(a), courts are allowed to terminate a case before hearing the merits whenever a defendant fails to defend an action.  *Id.*  Thus, this factor does not preclude the Court from entering default judgment against the Alliance Defendants.

B.      Requested Relief

If the factual allegations of a complaint provide a sufficient legal basis for entry of a default judgment, then the court conducts an inquiry to ascertain the relief.  *See Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957 (N.D. Cal. 2006).  Since the factual allegations of the FAC likely provide a sufficient legal basis for entry of a default judgment, the Court should assess the following relief sought by Plaintiffs: permanent injunction preventing the Alliance Defendants from using Ferriss's name, likeness, quotes, or any other indicia of sponsorship and from using the Krisa Trademarks; $1,284,000 for Plaintiffs' actual damages; $714,275 in defendant's profits; $100,000 or more in punitive damages and/or trebling of Plaintiffs' actual damages; and attorneys' fees and costs of $59,500.27.  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 18-24.

1.      Injunctive Relief

Plaintiffs seek permanent injunction preventing the Alliance Defendants from using Ferriss's name, likeness, quotes, or any other indicia of sponsorship and from using the Krisa Trademarks, relying on 15 U.S.C. § 1116 and Cal. Bus. & Prof. Code § 17203.  *Id.* at 18-19.

In determining whether a permanent injunctive relief is appropriate, courts must look to "well-established principles of equity."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  In other words, the plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Id.*

Here, Plaintiffs satisfied the four-factor test.

First, the Alliance Flyer displays Ferriss's name and picture as well as the Krisa Trademarks at the top of the first page of the flyer and again on the third page and attributes false quotes to Ferriss.  The quotes falsely attributed to Ferriss highly recommended the "get rich quick" scheme; these quotes misled consumers into believing that Ferriss endorses the Alliance Defendants' scheme.  This, in turn, caused reputational injury to Ferriss and the Krisa Trademark

15

by associating them with a fraudulent "get rich quick" scheme.  Moreover, Plaintiffs do not know how broadly the scam was distributed, how many members of the public fell prey to it, or the identity of people who were misled.  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 19.  Thus, Plaintiffs are unable to reach each of these people to repair the damage that has been done.

Second, monetary damages are inadequate to compensate for the injury because the Alliance Defendants could then continue to display the Alliance Flyer.  This will erode the quality of Plaintiffs' reputation and goodwill, which cannot be easily compensated with monetary damages, and continue to deceive consumers.

Third, without an injunction, Plaintiffs will continue to suffer because the Alliance Defendants can continue to display the Alliance Flyer, which would further erode the quality of Plaintiffs' reputation and goodwill.  On the other hand, the Alliance Defendants would not be burdened by the injunction, as they do not have the right to attribute false quotes to Ferriss or to infringe upon Krisa's trademarks.

Fourth, the requested injunction will serve the public interest by supporting publicity rights and trademark rights.  It will also alleviate consumer confusion and clear misunderstanding by dissociating Plaintiffs from the "get rich quick" scam.

2.   Monetary Damages

Plaintiffs seek $1,284,000 for Plaintiffs' actual damages; $714,275 in the Alliance Defendants' profits resulting from their misconduct; $100,000 or more in punitive damages and/or trebling of Plaintiffs' actual damages. Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 24.  Plaintiffs rely on their expert, Samantha Price.  *Id.* at 21.

a.   Actual Damages

Plaintiffs seek lost profits caused by the Alliance Defendants' misconduct, relying on Cal. Civ. Code § 3344(a) and 15 U.S.C. § 1117(a).  *Id.* at 21-22.

Price calculated Plaintiffs' reputational harm by using a willing licensor-willing licensee framework.  Docket No. 57 (Declaration of Samantha Price) at ¶ 36.  This approach contemplates a hypothetical negotiation between Ferriss and the Alliance Defendants for the right to use the

16

United States District Court
For the Northern District of California

Krisa Trademarks and Ferriss's name, likeness, and endorsement in connection with the Alliance Defendants' service. *Id*. The harm to Plaintiffs, then, is the amount that Ferriss would have received from the Alliance Defendants for the endorsement if the two parties had come to an agreement. *Id*.

The use of the willing licensor-willing licensee framework is not unreasonable because this is "the standard for measuring lost profits in a right of publicity case" like the instant case. *Clark v. America Online Inc.*, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000); *see also Hoffman v. Capital Cities/ABC, Inc.*, 33 F.Supp.2d 867, 875 (C.D. Cal. Jan. 22, 1999) (celebrity entitled to compensatory damages in an amount representing the fair market value of the right to utilize his name and likeness in the manner in which it was used by defendant magazine); *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1111 (9th Cir. 1992) (celebrity awarded the fair market value of his services on a voice misappropriation claim); *White v. Samsung Elec.*, 971 F.2d 1395, 1399 (9th Cir. 1992) ("the law protects the celebrity's sole right to exploit th[e] value" of her fame).

Using the willing licensor-willing licensee framework, Price estimated Ferriss's endorsement fee. For the estimation, Price examined the endorsement fees and speaking engagement fees of twenty select celebrities and calculated the ratios of the endorsement fee to speaking fee. The ratios range from 4.0 to 550.0. Price chose two numbers from the low end of the ratios, 4.0 and 10.7, and multiplied them by the range of Ferriss's speaking engagement fee, which is between $100,000 and $120,000. Price claims that the resulting range of $400,000 and $1,284,000 is the endorsement fee Ferriss would have commanded.

The Court finds Price's estimate to be without a reliable basis. Endorsements fees are analogous to royalties in that both are "payments received for the right to use intangible property rights." *Oregon State Univ. Alumni Ass'n, Inc. v. C.I.R.*, 193 F.3d 1098, 1100 (9th Cir. 1999) (defining royalties, for purposes of the exclusion from unrelated business income, as "payments received for the right to use intangible property rights"). Royalties are typically measured as a percentage of revenues derived from the use of an asset. Here, Price did not base its calculation on the revenues derived from Ferriss's endorsement. Instead, as described below, it is based on the value of Ferriss's endorsement in other contexts where the amounts of revenue at issue likely

17

exceeded, by a vast amount, the revenues earned by the Alliance Defendants.  In fact, as discussed more fully below, Plaintiffs failed to provide *any* evidence of the Alliance Defendants' profits, despite the Court's order.  Thus, the endorsement fees calculated by Price are insufficiently supported because the volume of sales that allegedly benefitted from Ferriss's endorsement is entirely unknown.  *See Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002) ("The mere existence of a fixed percentage royalty in a contract does not render that royalty a 'liquidated debt,' if the revenues to which that percentage figure is to be applied cannot be calculated with reasonable certainty.").

Moreover, there are specific problems with Price's methodology.  Price used the ratio range of 4.0 and 10.7.  These ratios were based on those of the nation's top celebrities.  4.0 belongs to Alicia Keys, and 10.7 belongs to Tiger Woods.  Julia Roberts and Leonardo DiCaprio each has a ratio of 6.7.  These are celebrities whose fame and influence substantially outweigh that of Ferriss.  Multiplying Ferriss's speaking fees by the ratios of these celebrities would overestimate Ferriss's endorsement fee.  Even Price herself admits that these celebrities are much more famous than Ferriss.  Docket No. 57 (Declaration of Samantha Price) at ¶ 45.

Second, the evidence provided by Plaintiffs in their supplemental brief, Docket No. 66 at 2-3, demonstrates that the requested fees are significantly greater than the endorsement fees Ferriss has actually commanded in the transactions where he did earn endorsement fees.  To date, Ferriss has engaged in ▮▮ endorsement deals where a fee was paid in exchange for his endorsement of certain products and/or services.  Docket No. 66 (Supplemental Declaration of Timothy Ferriss) at ¶ 2.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ███████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ██████     *Id.*   The range of $400,000 and $1,284,000 calculated by Price is significantly greater

4 than ████████ Ferriss has actually commanded.  Moreover, the level of Ferriss's endorsement

5 in the ████ endorsement deals was significantly higher than that of the false quotes on the flyers;

6 ███████████████████████████████████████████████████

7 ██████████████████████████████████████     The endorsement fees

8 earned by Ferriss in these ████ deals are not comparable to that earnable here.  More

9 fundamentally, the amount of sales generated in these ████ deals is not demonstrably comparable

10 to those generated by the flyers at issue.

         b.     <u>Defendants' Profits</u>

12        Plaintiffs seek to recover the Alliance Defendants' profits earned as a result of their

13 misappropriation of the Krisa Trademarks and Ferriss's name, photo, and false quote, relying on

14 California Civil Code § 3344(a) and 15 U.S.C. § 1117(a). Docket No. 53 (Plaintiffs' Motion for

15 Default Judgment) at 22-23.

16        Because the Alliance Defendants failed to provide any documents or data in this case,

17 Plaintiffs could only estimate how much money the Alliance Defendants made through their

18 scheme.  Docket No. 57 (Declaration of Samantha Price) at ¶ 53.  In making the estimate, Price

19 assumed that the statements on the Alliance Flyer and Wealth Partners Flyer are accurate.  *Id.*

20 These flyers contain a number of quotes from supposed customers that state the amount of money

21 each person earned.  *Id.*  By summing up the figures in these quotes, Price calculated the total

22 earnings by dealers.  *Id.* at ¶ 55.  Price, then, pointed out that new recruits must pay two fees to

23 enroll in the program described on the flyers: one to the dealer, which is the recruiter who mails

24 out the flyer, and the other to the entity associated with the flyer.  *Id.* at ¶ 54.  The Alliance Flyer

25 requests a $100 fee for the Dealer, and a $97 fee for Alliance.  *Id.* The Wealth Partners Flyer,

26 requests a $200 fee for the Dealer, and a $197 fee for Wealth Partners.  *Id.*  Using the dealers'

27 earnings as a proxy for what the associated entities earned, Price estimated that the $640,100

28 claimed by dealers on the Alliance Flyer translates to $620,897 in earnings for the associated

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  entity, Alliance Publishing Services.  *Id.* at ¶ 55.  The $94,800 claimed by Dealers on the Wealth

2  Partners Flyer translates to $93,378 in earnings for the associated entity, Wealth Partners

3  Publishing.  *Id.*  In total, Price estimated $714,275 in earnings for the entities associated with these

4  flyers.  *Id.*

5      Price's calculation cannot be sustained on at least two grounds.  First, Price's assumption

6  that the statements on the flyers are accurate is not only unsupported by any facts; it is also

7  inconsistent with Plaintiffs' position that these flyers are *fraudulent*.  Indeed, there is no evidence

8  how many people actually fell for this scheme.  Notably, the flyers themselves do not even explain

9  how one makes money by participating in the scheme; so without any record or other evidence of

10  revenues collected, sales made, etc., it is purely speculative to guestimate how much money

11  Defendants' actually collected.  Second, Plaintiffs cannot attribute all of the Alliance Defendants'

12  earnings from the scheme to Ferriss and Krisa Trademarks.  Although they are prominently

13  featured on the flyers, they are not the only ones endorsing the scheme.  Plaintiffs made no attempt

14  at allocating profits attributable to the Ferriss endorsement.

15      Finding this calculation to be unsupported, the Court requested that Plaintiffs provide

16  additional evidence of the Alliance Defendants' profits, Docket No. 62, but Plaintiffs failed to do

17  so, claiming that "the requested evidence is not available" without further explanation, Docket No.

18  66 at 4.

19      Thus, the Court denies Plaintiffs' request for the Alliance Defendants' profits.

20      c.    Punitive Damages

21      Plaintiffs seek punitive damages, relying on Section 3344 of the California Civil Code.

22  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 23-24.

23      In order to determine whether punitive damages should be awarded, and the amount to be

24  awarded the Court should consider: (1) the nature of defendant's acts; (2) the amount of

25  compensatory damages awarded; and (3) the wealth of the defendant.  *Prof'l Seminar Consultants,*

26  *Inc. v. Sino Am. Tech. Exch. Council, Inc.*, 727 F.2d 1470, 1473 (9th Cir.1984).  In California,

27  punitive damages must bear a reasonable relationship to actual damages, although there is no fixed

28  formula by which to determine the proper ratio.  *Biundo v. Old Equity Life Insurance Co.*, 662

F.2d 1297, 1300 (9th Cir. 1981); *Liodas v. Sahadi*, 19 Cal.3d 278, 284 (1977).  Within that framework, district courts have discretion in determining an appropriate punitive damages award on default judgment.  *Develder v. Hirshler*, 2014 WL 2858801, at *2-3 (E.D. Cal. June 23, 2014) (citing Fed. R. Civ. P. 55(b)(1)); *see Sino*, 727 F.2d. at 1473.

Since the Court does not award any compensatory damage, the Court denies Plaintiffs' request for punitive damages.

### d.   Treble Damages

Plaintiffs seek treble damages, relying on 15 U.S.C. § 1117. Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 23-24.  However, since the Court does not award any compensatory damage, there can be no trebling of the compensatory damage.

### 3.   Attorneys' Fees

Plaintiffs seek $51,522.68 in attorneys' fees, relying on Section 1117(a) of the Lanham Act, which provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party," 15 U.S.C.A. § 1117(a).  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 24.

At issue is whether this case falls within the scope of "exceptional cases" of trademark infringement arising under the Lanham Act.  The Ninth Circuit has interpreted the term "exceptional" to mean that "the defendant acted maliciously, fraudulently, deliberately, or willfully" or the plaintiff's case was "groundless, unreasonable, vexatious, or pursued in bad faith."  *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 615 (9th Cir. 2010).  Here, Plaintiffs pleaded in the FAC that "Defendants' infringement has been knowing, willful and deliberate." Docket No. 12 at ¶ 60.  Since the factual allegations of the complaint should be taken as true upon default, *TeleVideo Sys.*, 826 F.2d at 917-18, this case falls within the scope of "exceptional cases." *See Zynga Game Network Inc. v. Williams*, 2011 WL 2560240 (N.D. Cal. June 28, 2011) (holding that, upon entry of default, the plaintiffs' allegations in the pleading are sufficient to establish that this is an "exceptional" case for purposes of 15 U.S.C. § 1117(a)); *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282 (C.D. Cal. 2001) (holding that Pet store owner's willful infringement and dilution of television programmer's "Animal Planet" mark, and her

21

failure to appear and file answer in programmer's suit, resulting in default judgment, were exceptional circumstances entitling programmer to award of attorney fees and costs).

Since this case constitutes an exceptional case, the Court should determine the reasonableness of the attorneys' fees sought by Plaintiffs. The starting point for determining the amount of a reasonable fee is the lodestar, which multiplies the number of hours reasonably expended by the reasonable hourly rates. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).[1] There is a strong presumption that the lodestar figure represents a reasonable fee, although district courts may adjust this figure by the factors[2] laid out in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974); *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564-65 (1986).

Plaintiffs provided sufficient evidence of the $51,522.68 lodestar they calculated. Declarations by attorneys of the party seeking attorneys' fees are sufficient to establish the reasonableness of those fees if reasonable detail is provided. *Cyma (U.S.A.) Ltd. v. Lumondi*, Inc., 2011 WL 1483394, at *2-3 (N.D. Cal. 2011); *see Hensley v. Eckerhart*, 461 U.S. 424 ("Plaintiff's counsel . . . is not required to record in great detail how each minute of his time was expended."). Plaintiffs' counsel, Judith B. Jennison, provided a declaration explaining the lodestar, Docket No. 54, and provided supplemental briefing on it, per Court's order, Docket No. 64 (Supplemental declaration of Judith B. Jennison).

Based on the submitted evidence which the Court has reviewed, the Court finds that the number of hours billed by Plaintiffs is reasonable. In finding so, the Court also considered

---

[1] Although *Hensley* dealt with attorneys' fees under 42 U.S.C. §1988, the standards set forth in that opinion "are generally applicable in all cases in which Congress has authorized an award of fees.'" *Id.* at 461 n.7.

[2] These factors are: 1. the time and labor required; 2. the novelty and difficulty of the questions; 3. the skill requisite to perform the legal service properly; 4. the preclusion of other employment by the attorney due to acceptance of the case; 5. the customary fee; 6. whether the fee is fixed or contingent; 7. time limitations imposed by the client or the circumstances; 8. the amount involved and the results obtained; 9. the experience, reputation, and ability of the attorneys; 10. the undesirability of the case; 11. the nature and length of the professional relationship with the clients; and 12. awards in similar cases. *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

United States District Court
For the Northern District of California

1  whether Plaintiffs' counsel exercised billing judgment as well as the nature of the work performed.

2  Counsel for the prevailing party should make a good faith effort to exclude from a fee request

3  hours that are excessive, redundant, or otherwise unnecessary.  *See Hensley*, 451 U.S. at 434.

4  Here, Plaintiffs' counsel claims to have written off any "time for timekeepers with minor

5  involvement in this matter and time spent on efforts unrelated to the Motion for Default

6  Judgment."  Docket No. 54 (Declaration of Judith B. Jennison) at ¶ 22.

7       The Court also finds that the requested hourly rates are reasonable.  The established

8  standard of a reasonable hourly rate is the "rate prevailing in the community for similar work

9  performed by attorneys of comparable skill, experience, and reputation."  *Barjon v. Dalton*, 132

10  F.3d 496, 502 (9th Cir. 1997).  The party seeking an award of attorneys' fees bears the burden of

11  producing "satisfactory evidence – in addition to the attorney's own affidavits – that the requested

12  rates are in line with those prevailing in the community for similar services by lawyers of

13  reasonably comparable skill, experience and reputation."  *Camacho v. Bridgeport Fin., Inc.,* 523

14  F.3d 973, 980 (9th Cir. 2008).  "Generally, the relevant community is the forum in which the

15  district court sits."  *Id.* at 500.  Thus, for purposes of Plaintiffs' request of attorneys' fees, the

16  "relevant community" is the Northern District of California.

17       In their supplemental brief, Plaintiffs provided evidence of prevailing market rates in the

18  Northern California, which includes data on hourly rates for attorneys in San Francisco, Menlo

19  Park, Palo Alto, Redwood City, and Redwood Shores.  Docket No. 66 at 5.  The source of data is

20  the Valeo Attorney Hourly Rates Database provided by Valeo Partners LLC.  Valeo Partners is an

21  international consulting service that hosts a database containing the market rates and legal fees

22  charged by attorneys as reported in court filings.  The Valeo Database identifies hourly rates and

23  alternative fee arrangements of attorneys and support staff at over 950 law firms, including large,

24  middle-market, small, and boutique firms, in over 80 practice areas and in over 500 cities

25  worldwide.  The Valeo Database lists actual rates billed by attorneys.  Valeo lists hourly rates and

26  fees by individual attorney, firm, practice area, city of practice, experience, client and client's

27  industry.  This District has already found that the rates set forth in Valeo database are relevant.

28  *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. Dec. 12, 2014).

United States District Court
For the Northern District of California

Plaintiffs' counsel filtered Valeo hourly rate data for cases handled by Am Law 100 firms in which the attorneys were based in Northern California for the years 2015 and 2016.  Docket No. 66 (Declaration of Judith Jennison) at ¶ 6.  The filtering is reasonable because Perkins Coie is one of the Am Law 100 firms.  It is also reasonable that only those timekeepers identified as being in the intellectual property or litigation practice areas were considered, *id.* at ¶ 7, because the instant case is a litigation involving intellectual property claims.

Based on the analysis of the Valeo database, Plaintiffs successfully demonstrated that the rates for the three attorneys whose fees are requested by Plaintiffs are comparable to the prevailing market rates in Northern California for similar work performed by attorneys of comparable skill, experience, and reputation.

### 4.    Litigation Costs

Plaintiffs seek $7,977.59 in litigation costs, relying on 15 U.S.C. § 1117.  Docket No. 53 (Plaintiffs' Motion for Default Judgment) at 24.  Plaintiffs provided a schedule of costs describing the work involved for corresponding costs.  Docket No. 54 Ex. B.  Overall, the Court finds the requested costs to be reasonable.  However, the Court denies $5,000 in Samantha Price Expert Fee because it finds Price's calculation of actual damages and the Alliance Defendants' profits to be baseless.

Thus, the Court grants $2,977.59 in litigation costs, which equals the total requested litigation costs minus Price's expert fees.

## IV.    CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.    **ORDERS** a default judgment against Defendants Peagan Twitty, Alliance Publishing, Inc., and Alliance Publishing Services, Inc.;

2.    **GRANTS** Plaintiffs' request for permanent injunction preventing the Alliance Defendants from using Ferriss's name, likeness, quotes, or any other indicia of sponsorship and from using the Krisa Trademark;

3.    **DENIES** Plaintiffs' request for monetary damages;

4.    **GRANTS** Plaintiffs' request for $51,522.68 in attorneys' fees; and

1    5.    **GRANTS IN PART and DENIES IN PART** Plaintiffs' request for litigation

2          costs, granting $2,977.59 in litigation costs.

3    This order disposes of Docket No. 53.

4

5    **IT IS SO ORDERED**.

6

7    Dated: December 6, 2016

8                                                        _____

9                                                        EDWARD M. CHEN
                                                         United States District Judge
10